**Realdalist A. FAHIE, Plaintiff,**

v.

**Richard THORNBURGH, United States Attorney General, Defendant.**

**No. 86 Civ. 182 (RLC).**

United States District Court, S.D. New York.

Aug. 13, 1990.

---

**10.** Defendants' motion for sanctions pursuant to    Fed.R.Civ.P. 11 is therefore denied.

Stewart Lee Karlin, New York City, for plaintiff.

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City, for defendant; Diana Hassel, Craig A. Stewart, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

Plaintiff Realdalist A. Fahie was employed by the Federal Bureau of Prisons (the "Bureau") as a probationary correctional officer at the Metropolitan Correctional Center ("MCC") in New York City, from November 13, 1983, to September 14, 1984, when he was terminated. Fahie brought this action in January, 1986, pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, alleging that he was terminated because of his race and national origin. On January 12, 1989, the court dismissed this action as abandoned. It was later reopened pursuant to a motion by the plaintiff and a bench trial was held in April, 1990.

I.

Fahie was born in St. Thomas, Virgin Islands and is African–American. He joined the Navy in 1975, rising to the position of Master of Arms in which he performed various security functions. After receiving an honorable discharge from the Navy, Fahie attended the University of Alabama and received a Bachelor of Arts degree in criminal justice in 1982.

Fahie was hired by the Bureau and began work as a probationary correctional officer at MCC on November 13, 1983. All correctional officers employed by the Bureau must successfully complete a one-year probationary period before they may become permanent employees. All races are represented as correctional officers at MCC and it was estimated that at the time Fahie was employed 70–80% of the correctional officers were African–American.

Like all new correctional officers, Fahie spent his first week in training. Fahie began actual work in his second week and had what might fairly be called a difficult week on the job. Fahie testified that on his first day working the inmates were not behaving properly during strip searches. According to Fahie, he insisted on their compliance with the regulations and the inmates plugged the lock to his office door in retaliation. On his second day, this time in response to his enforcement of kitchen duty rules, the inmates serving food refused to do so and there was general bedlam in the kitchen. On his fourth day, as a result of disciplining a male inmate for talking to a female inmate rather than doing his work, the inmate retaliated by

throwing a trash can full of garbage on the floor. All three of these incidents required one of Fahie's superiors to come restore order to the floor.

Beginning in May, 1984, Fahie was assigned to Unit 7 North.[1] While stationed there, Fahie had disagreements with both inmates and other staff members. There was testimony from John Sanders, the Unit 7 North correctional counselor at the time Fahie was associated with the unit, that the inmates complained about Fahie, and that Fahie had argued with other staff members in front of inmates. In Sanders' opinion, Fahie treated the inmates in an unprofessional manner, and this led to their resentment of him. Additionally, Fahie and Sanders had a personality conflict which apparently arose from their incompatible philosophies regarding prison administration.

There was testimony that Fahie had an unexcused absence on June 24, 1984, when he was scheduled to work a double shift beginning at 3:30 p.m. and continuing until 8 a.m. the next day.[2] It is undisputed that Fahie called MCC at approximately 2:00 p.m. that day and told Lieutenant Smith that he could not come in, but here the recollections of the parties part ways. According to Fahie, he told Lieutenant Smith that he was sick and that he was vomiting blood, but that Lieutenant Smith insisted that Fahie come to work or he would be marked AWOL and possibly terminated from his job. Lieutenant Smith's recollection of the event is that although Fahie told him he was sick, he refused to provide anymore information. Lieutenant Smith then told him that if he did not provide more information, he would be put on AWOL status for Captain Bettencourt's review. It is undisputed that Fahie showed up for the second half of his shift, midnight to 8 a.m.

There was also testimony regarding Fahie's observance of the Bureau's uniform policy. The basic uniform for a correctional officer is grey pants, blue or white shirt, navy blazer and a tie. The uniform requirement is meant to be strictly observed and correctional officers are given an allowance to purchase the uniform. It is undisputed that Fahie did not wear a regulation uniform, but there is disagreement over whether or not he received a uniform allowance. The Bureau was unable to produce any sort of record showing that Fahie received the allowance.

While employed by the Bureau, Fahie received a number of evaluations. He received second, fourth and sixth month evaluations at MCC, and an evaluation in connection with training at the Federal Law Enforcement Training Center in Glynco, Georgia ("Glynco"). These reports all have various categories in which the employee is rated on a predefined scale. There is also room for general written comments.

Fahie's second month evaluation rated him as "marginal" in one-half of the categories and as "fully meets requirements" in the other half. Fahie was given an overall rating of "fully meets requirements." Plaintiff's fourth month evaluation rated him as "fully meets requirements" in every category. Fahie's sixth month evaluation, prepared in April 1984, rates him as fully successful in all areas, and as exceeding the performance standard in the areas of "Care and Accountability of Equipment, Tools and Keys" and "Supervision of Inmate Details and Activities." In all the evaluations, the written comments were mixed. In particular, there were a

1. MCC has an organizational structure which revolves around what is referred to as a "unit." Each unit has a "unit team" consisting of a unit manager, a case manager, and a correctional counselor. The unit manager is the senior staff member and the overall manager. The case manager is mostly concerned with handling paperwork and reports, and the correctional counselor is the equivalent of a social worker. Additionally, the correctional counselor assigns inmates to work duty such as kitchen crew or sanitation crew. Each unit also has one or more correctional officers whose main job is to maintain security.

2. The government also provided testimony that Fahie had another unexcused absence on August 26, 1984. Fahie expressly denies this. In any event, this occurrence would have been after Captain Bettencourt made the decision on August 24, 1984, to terminate Fahie, see infra at 313, and it therefore is irrelevant.

noticeable number of comments indicating that Fahie required much supervision.

Fahie's final report card for Glynco rated him as satisfactory in all categories and he was awarded a certificate of graduation. Among other things, the narrative summary of overall performance stated that Fahie "cannot accept constructive criticism as a means of improving his performance" and that with the proper training and guidance he should develop into an "average correctional employee."

Under the Bureau's guidelines, a probationary correctional officer may be terminated based on "deficiency in duty performance, lack of aptitude or cooperativeness, or undesirable suitability characteristics evidenced by his/her activities either during or outside official working hours." Federal Personnel Manual § 8–4(a)(1), (2). No sanction other than termination is available for probationary employees and approximately 30% of probationary employees are terminated.

On August 24, 1984, Captain Bettencourt recommended that Fahie be terminated. A termination letter signed by the Warden was given to Fahie on September 11, 1984, which stated that he was being terminated for his "continued marginal performance." More specifically, the termination letter mentions that Fahie was AWOL on June 23, 1984; that on July 13 and 14, 1984, he was involved in confrontations with other Bureau personnel; that he was unable to accept constructive criticism; and that he demonstrated "inattention to duties, lack of adequate assertiveness and lack of personal initiative."

Fahie's assertion that his termination was based on the grounds of race and national origin stems from a number of incidents. First, Fahie testified that at least twice he was told by Bettencourt to "get his black ass" out of her office. This was corroborated by Sharon Coard, a former employee of the Bureau who was a senior officer specialist at the time of her employment. Bettencourt denies making these statements. Fahie also testified that Bettencourt made fun of his pants, which were in a style common to the Caribbean, and Coard testified that Bettencourt called Fahie a "monkey" behind his back. Fahie testified that several Bureau employees made fun of his West Indian accent, including Lieutenant Castillo at MCC and fellow classmates at Glynco. Plaintiff also testified that an assistant instructor at Glynco told him that he "should get that black shit off of [his] head."

Fahie testified that his entering class consisted of four black and four white trainees. According to plaintiff, all of the white trainees passed their probationary period and all of the black trainees were discharged prior to the completion of their probationary period. Plaintiff further stated that when white employees made mistakes it was overlooked, but when black employees made mistakes they were reprimanded. Coard also testified that blacks and whites were afforded disparate treatment at MCC.

## II.

In bringing a case under Title VII, the plaintiff first bears the burden of proving a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). In order to establish a prima facie discriminatory discharge claim, a plaintiff must show that he is a member of a protected class, that he was satisfying the normal requirements of his work, and that he was either replaced by a non-minority worker or, if he was not replaced, that non-minority workers were retained while he was terminated. *Scott v. Federal Reserve Bank*, 704 F.Supp. 441, 448 (S.D.N.Y. 1989) (Sweet, J.).

If the plaintiff succeeds in proving a prima facie case, the burden then shifts to the defendant to articulate some legitimate, non-discriminatory reason for the employee's termination, *McDonnell Douglas Corp. v. Green, supra*, 411 U.S. at 802, 93 S.Ct. at 1824, which is clear and reasonably specific. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 258, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981). This burden is one of production, not of persuasion. The employer need "only pro-

duce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id.*

Once the defendant has articulated a non-discriminatory reason for the plaintiff's discharge, the burden shifts back to the plaintiff to prove that the nondiscriminatory reasons proffered by the defendant are simply a pretext for discrimination rather than the actual basis of the defendant's decision. *Id.* at 256, 101 S.Ct. at 1095. A plaintiff may prevail at this stage by either directly showing evidence of discriminatory motive, or indirectly by showing that the defendant's given reason is not worthy of credence. *Id.*

### III.

There is no dispute that Fahie is a member of a protected class. Accordingly, to determine whether Fahie has proved a prima facie case, the real issues in dispute are whether he was satisfying the normal requirements of his work and whether he was either replaced by a non-minority worker or, if he was not replaced, that non-minority workers were retained while he was terminated.

■ There is conflicting evidence as to whether plaintiff was performing his work in a satisfactory manner. Both sides called other MCC employees as witnesses and their evaluations of Fahie's performance was mixed. Lester Jones, a correctional supervisor, and Arthur Brown, a training officer, both found Fahie's work satisfactory. Conversely, John Sanders, a counselor, testified that he thought plaintiff's work was poor. Adam Wanamaker, a lieutenant, also rated plaintiff's performance as poor. Martin Gamble, the Chief Instructor at Glynco Training Center in Georgia, testified that Fahie had difficulty accepting constructive criticism. Willie Smith, a lieutenant, gave Fahie a mixed review.

Additionally, Fahie's written evaluations must be considered. Although these evaluations tend to be more complimentary than the testimony and, indeed, generally rate his performance as "satisfactory," they also include some negative comments, particularly about Fahie's difficulty working independently.

The specific incidents testified to must also be taken into consideration. There was much testimony, including from Fahie himself, that he was unable to enforce the rules without assistance from the senior officers. Although most of these problems appear to have taken place at the beginning of his employment, there was also testimony that Fahie was still having problems six months later.

Weighing all the evidence together, the court finds that Fahie has not shown that he was satisfying the normal requirements of his job. Working with people, both the inmates and other staff members, is an important part of being a correctional officer. In particular, it cannot be doubted that the Bureau has an interest in having correctional officers who are able to discipline and control the inmates without engaging their animosity. Surely this must be considered one of the most important duties of the position. There is sufficient evidence that Fahie had difficulty controlling the inmates and working with other people to conclude that he was not doing satisfactory work.

Fahie has offered no evidence that a non-minority worker was hired to fill his position. However, he has testified that non-minority workers were retained while he was replaced. In particular, he testified that out of the eight trainees in his class, four black and four white, all four blacks were terminated and all four whites retained. Plaintiff has also provided an exhibit breaking down the removals and terminations[3] by race for the period from

---

**3.** Although they are broken down categorically, there was no testimony regarding the difference between "removals" and "terminations," nor any explanation in Exhibit 30 itself. For the purposes of this discussion, the court will combine these categories and use the term "terminations." Additionally, the exhibit does not state, and there was no testimony regarding, whether its figures are only for correctional officers or for all employees.

December 1984 to February 6, 1985.[4] According to this exhibit, of the twelve individuals terminated during this period, eight were black.

Plaintiff's evidence regarding non-minorities retained while he was terminated is too casual to be persuasive. Fahie has not presented any evidence regarding the performance records of any of the retained or terminated employees. For all the court knows, all those who lost their jobs were terminated for just cause and all those retained were superior employees.

Exhibit 30 is likewise not helpful. Not only does it not provide any performance history of the employees terminated, but it even fails to break down the groups in percentages. Assuming that Exhibit 30 is only for correctional officers, the fact that two-thirds of those terminated in this time period were black does not seem out of line when 70–80% of the correctional officers were African–American.

Evening assuming, *arguendo*, that plaintiff has made out a prima facie case by showing that his work was satisfactory and non-minorities were retained while he was terminated, the Bureau has articulated a sufficient non-discriminatory reason for plaintiff's termination—that his work was of marginal quality. Even if the court were to find for the purposes of plaintiff's prima facie case that he was performing his duties in a satisfactory manner, the Bureau's honestly held, although erroneous, conviction that Fahie was not a good employee is a legitimate ground for dismissal. *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir.1988) ("the reasons tendered need not be well-advised, but merely truthful").

The trial testimony showed that Fahie got off on the wrong foot and, try as he might, was not able to resurrect his superior's opinion of his work. Whether this is fair or sensible is beyond the purview of the court. Although employers are not free under Title VII to fire employees for a discriminatory reason, they remain free to fire employees based on an incorrect assessment of their performance.

Additionally, Fahie's evidence of racial bias is insufficient to prove pretext. Fahie has testified that Captain Bettencourt said on at least two occasions that she was going to "fire [plaintiff's] ass" and told him to "get [his] black ass out of the office."[5] Bettencourt has denied making these statements. While this language is hardly enlightened and may properly be characterized as abusive, without more it is insufficient to sustain a Title VII claim. Captain Bettencourt may have been offensive, but a discrimination claim cannot be based on a lack of manners, particularly since there is no evidence that Captain Bettencourt was verbally less harsh to other employees. Plaintiff's complaint about the instructor or his classmates at Glynco cannot be considered since there is no evidence that any of these people had any involvement in the decision to terminate plaintiff.

## IV.

In sum, the court finds that the plaintiff has not met his burden of showing that he was performing his work in a satisfactory manner or that non-minority workers were retained while he was replaced. Accordingly, he has failed to make out a prima facie case of discrimination, and therefore judgment is for the defendant.

IT IS SO ORDERED.

---

**4.** Although the sheet is labelled as "February 6, 1985—December 1984," plaintiff's counsel explained at trial that it covers the period from December 1984 to February 1985.

**5.** The government has attempted to show that Fahie's complaints of racial bias are fabricated by proving that Fahie did not allege the statements he now alleges when filing his Equal Employment Opportunity Commission complaint. Indeed, according to the government, Fahie only mentioned certain of the racial incidents after reading the affidavit of Sharon Coard in which she noted the incidents. Although the court notes that this is rather suspicious, it is not necessary to address this issue.