John J. TOYEE, Plaintiff,

v.

Janet RENO, Attorney General, Defendant.

Civil Action No. 95–40150.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 30, 1996.

Barbara Harvey, Detroit, MI, for Plaintiff Toyee.

William L. Woodard, Asst. U.S. Atty., Detroit, MI, for Defendant Reno.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

GADOLA, District Judge.

Before the court is the defendant's motion for summary judgment on plaintiff's claim

under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*[1] The plaintiff, John Toyee ("Toyee"), filed a complaint in the present action on April 10, 1995, alleging that as a result of discrimination against him based on his national origin (Iraqi), he was harassed, humiliated, and terminated from his position as a probationary Correctional Officer at the Federal Correctional Institution in Milan, Michigan. The defendant, Janet Reno ("Reno"), brought the present motion for summary judgment on January 5, 1996, asserting that plaintiff has failed to establish a prima facie case of national origin discrimination for purposes of a Title VII action.

This court has considered the pleadings and has determined that oral argument is not necessary to the disposition of this motion. Local Rule 7.1(e)(2) (E.D.Mich. Jan., 1992). For the reasons stated below, this court will grant the defendant's motion for summary judgment regarding plaintiff's Title VII claim.

### I. Factual and Procedural Background

On May 31, 1992, Toyee, a naturalized American citizen born in Baghdad, Iraq, was hired at the Bureau of Prison's ("BOP") Federal Correctional Institution in Milan, Michigan ("FCI–Milan"), as a GS–6 Correctional Officer trainee. Toyee had to complete a one year probationary period, which included three weeks of institution familiarization classes at FCI Milan. Three weeks after he began the classes, Toyee was fired for breach of institutional security and inattention to duty.

### 1. Use of restraints incident

Toyee claims that the first incident of national origin animus against him occurred during the first day of Institutional Familiarization, when he and the other trainees were asked to identify themselves. Toyee says that the class instructor, Assistant Security Officer Douglas Straub ("Straub"), was enthusiastic when the trainees stated their

---

1. Plaintiff also raised a First Amendment claim alleging that his right to freedom of speech was violated when he was disciplined for wearing a Malcolm X emblazoned T-shirt. That claim was the subject of the defendant's concurrent motion to dismiss that First Amendment claim which was granted today by separate order. As such, the instant motion for summary judgment will only address plaintiff's Title VII claim.

names and where they were from, but when Toyee said he was from Baghdad, Iraq, Straub's face "went blank" and Straub said "Ah, okay."

The second incident of alleged harassment occurred later that day during a class on the use of restraints. Toyee claims that Straub belittled and ridiculed him in front of the class when he incorrectly placed handcuffs, leg irons, and a waist chain on his partner, Angela Flint ("Flint"). Toyee says that Straub paraded him and Flint in front of the class and asked Toyee whether he was "Blind? Are you stupid? Why did you put them on like this?" Toyee claims that other trainees also placed the restraints on incorrectly, but Straub did not treat them as poorly.

Straub said Toyee improperly attached the handcuffs to the leg irons on Flint, causing her to be bent over and in pain. Straub said Flint called to him and asked for help. Straub said that when he asked Toyee why he had not followed directions, Toyee responded that he wanted to "try something different." Furthermore, Straub says that when he told Toyee that he did not apply the restraints properly, Toyee did not appear to be "very concerned about it in any way." Straub then brought trainee Marc Calandra ("Calandra") to the front of the class and demonstrated the proper restraints technique. Calandra confirms that Straub used him to demonstrate the techniques. Straub reported Toyee's behavior and actions to Employee Development Specialist Rex Parrish ("Parrish") after the class. Straub also prepared a memorandum of the incident, and refused to certify Toyee on the use of the restraints.

Angela Flint, an intern at FCI Milan's accounting department, was Toyee's partner during the restraints course during Institutional Familiarization. Flint said Toyee placed the restraints on her incorrectly, causing pain and "red marks" to her wrists and ankles. Flint confirms that Straub brought her and Toyee before the class to demonstrate Toyee's incorrect technique, which she claims was an "uncomfortable situation" for her. As a result, Flint said that she did not want to serve as Toyee's partner during fur-

ther exercises because she did want to be placed in front of the class again and be "made notice of like that." Flint did not recall whether the instructor ridiculed Toyee. Toyee, however, claims that Flint was not bent over by the shackles and was not in pain.

None of the other three trainees who participated in Toyee's classes said that Straub or any other instructor reacted negatively to Toyee's ethnicity. One trainee, Calandra, did not recall whether Toyee had said he was from Baghdad, Iraq. He did, however, recall that Toyee said he lived in Detroit. Calandra stated that Toyee "wired up" his partner in restraints class in such a way that she was in pain. Calandra said that when Straub corrected him, Toyee appeared to tell Straub that his way of using the restraints was better than Straub's way. Calandra did not recall Straub being abusive to Toyee.

Another trainee, Christine Ettig ("Ettig"), said she was unaware that Toyee came from Iraq, but recalls he said he lived in Detroit. Ettig said Toyee "did so many absolutely ridiculous things during our class that I was afraid for him to work there." Ettig said that when Toyee placed restraints on his partner, her wrists were cuffed to her ankles, and Toyee "thought it was funny." Ettig said Straub asked Toyee whether he had been paying attention to the instructions on use of restraints, and Toyee responded that "he had learned it somewhere else." Ettig stated Straub did not call Toyee "blind" or "stupid", or ridicule him.

Ronald Heinreich ("Heinreich") also trained with Toyee. He said that Toyee painfully "hog tied" his partner in restraints class, and then laughed about it. Heinreich said Straub corrected him for this. Heinreich said Straub was professional to everyone in the class, and did not recall Straub calling Toyee "blind" or "stupid."

Toyee stated that during a subsequent assignment at the armory, Straub told him and Angela Flint to stay away from handcuffs and leg restraints in order to get a laugh from other trainees. Toyee also said Straub made fun of his name in front of the other trainees when he asked him to "bring those

toys over there," referring to the restraints. Straub denied making this statement. The three trainees in Toyee's class who were interviewed, Calandra, Ettig, and Heinreich, said they did not recall Straub making fun of Toyee's name, or referring to the restraints as "toys" or "toyees."

Parrish, who coordinates the efforts of instructors like Straub, remembers that Straub was not going to certify Toyee on the use of restraints because Toyee was not following directors or BOP policies on their use. Parrish said he documented Straub's concerns in Toyee's probationary record.

## 2. Self-defense class incident

Toyee claims that when he was in self-defense class, Pat Walters ("Walters") and Darryl Eades ("Eades"), the instructors, asked the trainees to identify themselves. Toyee stated that when he told them his name and origin, Walters' and Eades' smiles were replaced by "blank" looks. Toyee claims that Walters and Eades used him for demonstrating techniques more often than other trainees. He said that Walters gave him a pen, asked him to attack him with it, and then flipped him to show the others how to fend off an inmate with a knife. He claims he was attentive in the class and "repeatedly asked" the instructor whether he was doing techniques correctly. Moreover, Toyee acknowledges that the instructors gave him the same feedback that they gave to the other trainees.

According to Self–Defense Instructor Walters, Toyee refused to practice the Aikido moves he taught and was not amenable to instruction. Walters said, "I've never had to work with a student that is just not flat wanting to participate with the class or appeared to be not wanting to participate with the class." Walters said he reported Toyee's refusal to participate to Parrish. Walters was told by Parrish to prepare a memorandum documenting Toyee's performance. Walters claims that he was unaware of Toyee's national origin, but said it was his practice to ask employees to introduce themselves at the beginning of the class. Overall, it appeared to Walters that Toyee was not taking the training seriously.

Eades, who taught self-defense with Walters, said Toyee was "disruptive" in class and did not want to learn the Aikido techniques being taught. Eades stated that Toyee disturbed the other students when he "kept making references to techniques he'd learned in various other places." Eades told Toyee to keep his comments until the end of the class. Eades observed that Toyee also interfered with the instruction because of his frequent comments and attempts to perform techniques on other students during the instruction. Eades remembers that Walters wrote a memorandum about Toyee's actions in class. Eades said that Toyee was not responsive to the instruction and wanted to do things his own way. Eades did not know Toyee's ethnicity was Iraqi. He thought Toyee was Hispanic.

Trainee Calandra said Toyee was the only one that tried to fight back in Aikido class, which is contrary to the training. Calandra said Toyee had a "know it all" attitude and that in his opinion Toyee "was not right for the job" because of his poor attitude and personality. Trainee Ettig observed that Toyee was not paying attention in self-defense class and the instructors corrected him several times for this.

Parrish received and documented a complaint from self-defense instructor Walters, stating that Toyee was not participating in the self-defense class. Parrish forwarded all this information to his supervisor, Employee Development Manager Cynthia Stowell.

## 3. Ice Machine incident.

Ettig observed Toyee putting his hand in an inmate ice machine and taking out some ice, and that this angered several inmates. She said Toyee swore back at the inmates, which was "absurd." Calandra confirmed that Toyee offended a group of inmates when he scooped out some ice from the inmate ice machine with his hand, rather than using the ice scoop.

## 4. Use of chits incident.

The next incident Toyee placed at issue occurred the following week when Toyee was assigned to work the compound. Toyee

claims he forgot his chits and was unable to check out the equipment he needed to work his post. After he was denied equipment from the supply room, Toyee said Lt. Tyrone Silver ("Silver"), his supervisor, told him to see the Captain and state, "I, John Toyee, got my head in my ass. Please give me some chits." There is no indication that Toyee was actually made to say this in order to obtain chits for that day.

Lt. Silver was the training lieutenant when Toyee was in Institution Familiarization. Silver noted that Toyee was having problems with comprehending the information or abiding with BOP policies. One time, Silver saw Toyee arrive without his proper uniform, key chain or chits. He counseled Toyee about the chits and uniform, and Toyee told him he did not bring them because he did not think they were important. Silver denies telling Toyee to tell the Captain he had his "head up his ass." Silver had instructed Toyee the prior week about the need to wear the proper uniform and to have the key chain and chits. Silver stated that Toyee gave the impression that the training "was kind of like a joke," and did not seem to be as serious about it as other trainees. Silver said Toyee was having "problems with several other staff members," and although he could not recall the specific problems, he did say that Toyee was "having difficulty following directions."

### 5. Assignments

Toyee also claims that he was not given the opportunity to work different posts, like the control room, which other trainees were afforded. He also said that Lt. Silver told him "we're going to have to put you somewhere where we can watch you." Toyee says he felt ostracized by supervisors who were willing to help others, but not him. Toyee said he felt he had to initiate a request for assistance, while other trainees did not have to do this.

Lt. Silver states that Toyee was rotated to different posts like the other trainees. Lt. Silver admits he may have told Toyee he was going to have to watch him, but that if he said this, it was said in a joking manner.

Silver said he was unaware of Toyee's ethnicity at the time.

### 6. Co-trainees action

Toyee also claims that his co-workers harassed him because of his national origin. He claims that when he and another co-worker were playing fooseball, a third co-worker accused Toyee of cheating, stating "you foreigners always cheat." Toyee said that before he responded, other co-workers told the third co-worker to "be quiet" and that was the end of it. Trainee Heinreich said he did not tell Toyee that "you foreigners are always trying to cheat," but he did state that he thought that the person Toyee was playing with was "ripped off" at one point. Heinreich maintained that Toyee was not harassed or discriminated against because of his national origin.

### 7. Use of improper T-shirt incident.

Toyee claims that on June 16, 1992, he was told to dress comfortably because the trainees were going to be working out. Toyee wore a T-shirt, jogging pants and tennis shoes to work. Toyee's T-shirt was emblazoned with a Malcolm X logo. Toyee said that Training Supervisor Cynthia Stowell corrected him about wearing that shirt because it was inappropriate and that Toyee acknowledged Stowell by replying "okay."

Stowell was in charge of training new employees when Toyee was hired. She asserts that her concern was that Toyee was not dressed appropriately, and that Toyee was the only trainee not in uniform. Stowell also said that Toyee's Malcolm X T-shirt was inappropriate because it had a political message on it "related to the Black Panther organization" which "created quiet [sic] a stir with the inmate population." She said she told Toyee that it was poor judgment to wear that shirt at the institution.

Stowell indicated that several instructors told her they had concerns about Toyee, and she forwarded their comments to Associate Warden Michael Janus. One concern came from Straub, who refused to certify Toyee on the use restraints because Toyee had indicated that he had his own method of applying restraints and was not interested in the BOP

method of applying restraints. Stowell said that on one occasion, she saw Toyee lay his head on a table during a class, and she told him to sit up. On another occasion, when she sat in on a self-defense class, Toyee did not seem interested in the course. Stowell opined that the overall impression Toyee gave was that he was not interested in the training.

### 8. The security incident at the sally-port gate.

Toyee claims that later that same day, June 16, 1992, as he was exiting the prison to go to lunch, he was made to wait at the first set of sally port gates for "five or six minutes", because they would not open. There is a security camera at the gate to the sally port which is mounted on the ceiling. Toyee claims that when an A-corridor officer came and stood next to him, the doors "immediately" opened. Toyee claims that he then waited again between the inner and outer gates of the sally port, and took his identification card out, faced the camera, placed the card under his chin, but the gate still would not open. Toyee said he then took his card and "raised it towards the camera to identify myself", and after a few minutes, the gate opened. Toyee claims that he did not cover the camera lens with his card. He claims that the Control Room personnel, who operated the sally port doors, knew him because they had photographs of all the new employees.

Toyee further claims that the Control Room personnel delayed opening the sally port doors to harass him because of his national origin. He admits that for the prior 16 days, he had no problems entering or exiting the facility. Toyee explained that during these prior times, he was dressed either in his uniform or a shirt and pants. Then, Toyee states, Control Room Officer Steven Culver ("Culver") asked him to come to the door and yelled at him, saying that he did not have to present his card so many times because Culver had seen him on the monitor. Toyee says he told Culver not to yell at him, but that Culver did not stop.

Steven Culver says he saw Toyee waiting at the south entrance to the sally port, which is the main entrance and exit of the prison, but that he was unable to immediately open the gate because he was too busy verifying a prisoner count. He says that Toyee then placed his identification card right up to the camera that monitored the south gate, covering his view. He said he never saw the A corridor officer that Toyee claimed was present. Culver said that when Toyee came through the sally port, he called Toyee over to the door. Then, Culver says he spoke to Toyee through a slot in the Control Room door, and that he had to bend down and speak loudly so that Toyee could hear him. He told Toyee about the proper procedures to exit the sally port, that he must never cover up the camera lens, and that covering the camera was a breach of security. Culver maintains that he would have said the same thing to anyone who did this, even his best friend. Culver was unaware of Toyee's national origin at that time.

Correctional Officer Robert Lesner ("Lesner") was also working the Control Room with Culver when Toyee covered the camera. He said the Control Room was very busy at the time, and that he saw Toyee cover the south grill camera with his identification card. Lesner said they rely on that camera to observe that area of the sally port because it can not be seen from the Control Room, and that Toyee completely blocked the view. Lesner stated Culver spoke to the Toyee about what he did, and Toyee "got loud and abusive." He claims, however, that Culver was not abusive with Toyee. Lesner said he has seen people become impatient waiting for the south gate of the sally port to open when the Control Room is busy, but that they never act the way Toyee did. He was surprised that a new employee would act in that manner.

Assistant Security Officer Straub said he observed Toyee waiting to come through the gates in the sally port. He saw Toyee walk to the gate and place his identification card over the camera lens, completely blocking the view of the monitor. Straub said that when this happened, two inmates were standing in the corridor which opened to the sally port. He says there was concern that Toyee was aiding an escape attempt. Straub said

that Control Room Officer Bob Lesner told him to call the A Corridor Officer and have him tell Toyee to step away from the monitor. Straub says that he either called the A Corridor Officer on his radio, or Culver telephoned him. Straub said that when the monitor cleared, the A Corridor officer was standing next to Toyee.

Straub states that when Toyee exited the sally port, Control Room Officer Steve Culver told Toyee never to cover the lens of the camera, especially when inmates were present in the corridor, because it obstructed the view of the Control Room personnel. Straub noted that Culver spoke loudly because he was speaking through the key slot in the Control Center door.

**9. Toyee's termination.**

On June 19, 1992, Toyee was asked to report to the personnel office, where he was interviewed by Acting Captain Secrease. Secrease showed Toyee several memoranda prepared by FCI–Milan employees critical of plaintiff's performance, and asked him for an explanation. Plaintiff admitted to covering the security camera with his ID card, but denied the other allegations and accused his instructors of lying. Toyee was belligerent throughout the interview. Secrease recommended to Warden Bogan that plaintiff be terminated immediately.

Toyee was then interviewed by Associate Warden Janus who went over the complaints against him. Plaintiff again denied the charges and accused those staff members that were critical of him of lying. He also accused them of discriminating against him because of his ethnicity, but provided nothing more substantial than conclusory allegations. Janus recommended plaintiff for discharge because of the series of poor judgments he had made, and because he believed him to be unfit for further development as a correctional officer.

Based on the recommendations of Janus and Secrease, Warden Bogan, who approved all hiring and firing decisions at FCI–Milan decided to terminate plaintiff from employment immediately.[2] Bogan determined that Toyee was unfit to be a correctional officer because of his misconduct and demonstrated poor judgment, and Bogan doubted that Toyee would remediate his behavior. Specifically, Toyee was fired for obscuring the video camera, failing to be attentive in class, ignoring instructions concerning the proper application of restraints, and his recalcitrant reaction when corrected by others. Bogan cited Toyee's "poor" attitude, and that he "could not be corrected by his supervisors when problems were pointed out to him," as contributing to his firing. On June 19, 1992, Toyee was provided with a written notice of termination setting forth the specific grounds for his discharge, signed by Warden Bogan, to be effective as of midnight on that date.

Toyee contacted an Equal Employment Opportunity Commission ("EEOC") counselor on March 3, 1993, and filed a complaint on April 15, 1993. The complaint was accepted and investigated. Toyee requested a hearing before an Equal Employment Opportunity Commission Administrative Judge, and a hearing was held on September 28–30, 1994. The Administrative Judge issued a recommended decision on October 24, 1994 finding discrimination and recommending relief. On January 9, 1995, the United States Department of Justice issued its final agency decision rejecting the administrative judge's recommended finding of discrimination as "clearly erroneous" and finding in favor or the Bureau of Prisons.

**II. Summary Judgment Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essen-

---

**2.** Termination is the only disciplinary measure permitted by the Bureau of Prisons against a probationary employee.

tial element of the non-moving party's case on which the non-moving party would bear the burden of proof at trial. *Martin v. Ohio Turnpike Commission*, 968 F.2d 606, 608 (6th Cir.1992); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the non-moving party. *60 Ivy Street Corporation v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987). The court is not required or permitted, however, to judge the evidence or make findings of fact. *Id.* at 1435–36. The moving party has the burden of showing conclusively that no genuine issue of material fact exists. *Id.* at 1435.

A fact is "material" for purposes of summary judgment where proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984). In other words, the disputed fact must be one which might affect outcome of the suit under the substantive law controlling the issue. *Henson v. National Aeronautics and Space Administration*, 14 F.3d 1143, 1148 (6th Cir.1994). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* Accordingly, where a reasonable jury could not find that the non-moving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate. *Feliciano v. City of Cleveland*, 988 F.2d 649 (6th Cir. 1993).

Once the moving party carries its initial burden of demonstrating that no genuine issues of material fact are in dispute, the burden shifts to the non-moving party to present specific facts to prove that there is a genuine issue for trial. To create a genuine issue of material fact, the non-moving party must present more than just some evidence of a disputed issue. As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986):

There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the [non-moving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

(Citations omitted); *see also Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Consequently, the non-moving party must do more than raise some doubt as to the existence of a fact; the non-moving party must produce evidence that would be sufficient to require submission of the issue to the jury. *Lucas v. Leaseway Multi Transp. Serv., Inc.*, 738 F.Supp. 214, 217 (E.D.Mich.1990), *aff'd*, 929 F.2d 701 (6th Cir.1991).

### III. Applicable Law

In bringing a case under Title VII, the plaintiff first bears the burden of proving a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). In order to establish a prima facie discriminatory discharge claim, a plaintiff must show that: 1) he is a member of a protected class, (2) he was satisfying the normal requirements of his work, 3) he was discharged from the position, and (4) for the same or similar conduct he was treated differently than similarly-situated non-minority employees. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Mitchell v. Toledo Hospital*, 964 F.2d 577, 582 (6th Cir. 1992); *Meiri v. Dacon*, 759 F.2d 989, 995–96 (2d Cir.) *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985) (requiring, as the fourth element, that a showing that the discharge occurred in circumstances giving rise to an inference of discrimination). *See also Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978) (finding that the elements of proof in employment discrimination cases were not intended to be "rigid, mechanized or ritualistic.") In *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Court stated that "[t]he burden of establishing a prima facie

case of disparate treatment is not onerous." *Id.* at 253, 101 S.Ct. at 1094. *See also Wrenn v. Gould,* 808 F.2d 493, 500 (6th Cir.1987). However, failure to prove any one of the elements by a preponderance of the evidence mandates dismissal of plaintiff's suit. *Morvay v. Maghielse Tool & Die Co.,* 708 F.2d 229, 233 (6th Cir.), *cert. denied,* 464 U.S. 1011, 104 S.Ct. 534, 78 L.Ed.2d 715 (1983).

If the plaintiff succeeds in establishing a prima facie case, the burden of *production* shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. *Galbraith v. Northern Telecom, Inc.,* 944 F.2d 275, 282–83 (6th Cir.1991). The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 510, 113 S.Ct. 2742, 2748, 125 L.Ed.2d 407 (1993). The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting process the ultimate burden of proving intentional discrimination always rests with the plaintiff. *See Burdine,* 450 U.S. at 253, 254, 256, 101 S.Ct. at 1093, 1094, 1095.

Once the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual. *Id.* He may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *Burdine,* at 256, 101 S.Ct. at 1095.

■ In *Hicks,* the Court held that a plaintiff does not discharge his ultimate burden of persuasion by merely convincing the trier of fact that the defendant's proffered reasons are pretextual. The plaintiff must convince the fact finder "*both* that the reason was false, *and* that discrimination was the real reason." *Hicks,* 509 U.S. at 515, 113

S.Ct. at 2752. (emphasis in original). "It is not enough … to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination. *Id.* at 519, 113 S.Ct. at 2754 (emphasis in original). The factfinder's rejection of the employer's proffered, legitimate reason *permits,* but does not compel, a verdict for the plaintiff. *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1083 (6th Cir.1994) (citing *Hicks,* at 511, 113 S.Ct. at 2750–51). The test is whether the plaintiff ultimately persuades the factfinder that the employment decision was caused by bias, and for that purpose both the plaintiff's prima facie case and the factfinder's rejection of the employer's proffered evidence are circumstantial evidence of unlawful discrimination. *Id.*

■ Therefore, to defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *See Terbovitz v. Fiscal Court of Adair County,* 825 F.2d 111, 114–15 (6th Cir.1987). *See also Fuentes v. Perskie,* 32 F.3d 759, 763 (3rd Cir.1994) (citing *Hicks* at 510–511, 113 S.Ct. at 2748–49). While this standard places a difficult burden on the plaintiff, it arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decision making by employers. *See Fuentes,* at 765.

### IV. Analysis

### 1. Prima Facie Case

There is no dispute that Toyee is a member of a protected class or that he was discharged. Accordingly, to determine whether Toyee has proved a prima facie case, the real issues in dispute are whether he was satisfying the normal requirements of his work and whether he was treated differently than similarly-situated non-minority employees for the same or similar conduct. As the record in

this case clearly demonstrates, Toyee has failed to allege facts sufficient to establish a prima facie case of unlawful discrimination.

Toyee has not offered evidence to prove that he was qualified for the job. To demonstrate that he is qualified, a plaintiff must show that he was performing his job to the satisfaction of his employer. *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 548 (6th Cir.1991). A plaintiff may not create an issue of fact by challenging the soundness or wisdom of his employer's business decision. *Ang*, 932 F.2d at 549. *See also Wilson v. Communications Workers of America*, 767 F.Supp. 304, 307 (D.D.C.1991) (concluding that where a plaintiff fails to establish that his/her qualifications were similar to the qualifications of non-protected class employees, summary judgment in favor of the employer is appropriate).

The record is clear that BOP officials decided to fire Toyee because he had demonstrated, to nearly all of the training personnel he came in contact with, that he had a poor attitude, was not cooperative, did not take training or criticism well, and based on this, was not qualified to be an acceptable BOP employee. Toyee's poor attitude was confirmed by the testimony of BOP management officials, trainers, and Toyee's fellow trainees. Nobody, except for Toyee, offered any evidence to rebut BOP's finding that Toyee had a poor attitude. Furthermore, the three incidents cited as a basis to fire Toyee all demonstrate that Toyee's poor attitude made him unqualified for the job.

For instance, the record supports Straub's charges that Toyee failed to follow directions on the use of restraints when he attached the handcuffs to the leg irons of his partner, Angela Flint, causing Flint to be bent over and in pain. Straub said that he corrected Toyee, asked him why he did not follow directions, and that Toyee responded that he wanted to try it "his way."

All three of Toyee's fellow trainees who witnessed this incident fully supported Straub. Marc Calandra said that Toyee "wired up" Flint, causing her to be in pain. Calandra said that when Straub corrected Toyee, he appeared to state that his way of using the restraints was better than Straub's

way. Ronald Heinreich said Toyee painfully "hog tied" Flint. Christine Ettig and Heinreich said that Toyee laughed about what he did to Flint. Ettig said that when Straub corrected him, Toyee told Straub he had learned it "somewhere else." These three statements, which fully support Straub's testimony, support a finding that Toyee was not qualified for the job.

The self-defense class incident also supports a finding that Toyee was not qualified for the job. Self-defense instructors Pat Walters and Darryl Eades said that Toyee was not paying attention in class, was disruptive when he practiced his own techniques on other students while they were lecturing, did not listen to their directions, and did not appear to be serious about the class. Their testimony is supported by Trainees Calandra and Ettig, who stated that Toyee did not follow directions, had a "know it all" attitude and that Eades and Walters corrected him for not paying attention in class. Only Toyee's unsupported assertions rebut this testimony which supports a finding that Toyee was not qualified for the job.

Finally, the breach of security incident, when Toyee obscured the security camera in the sally port, indicates that Toyee was not qualified for the job. It is clear from the record that this incident occurred. Toyee admitted that he raised his identification card up to the camera. The three BOP employees in the Control Room all stated they saw the monitor obscured by Toyee's card. It is also clear that obscuring a security camera which views the exit of a prison is a breach of security. Therefore, this incident also supports a finding that Toyee was not qualified for the job. As such, no reasonable trier of fact could find, based on the record, that Toyee was qualified for the job and therefore plaintiff has failed to make out a prima facie case.

Toyee has also failed to submit any relevant evidence that he was treated differently than similarly situated non-minority employees. To satisfy this fourth element of the test, plaintiff must demonstrate that the individuals to whom the plaintiff is comparing himself dealt with the same su-

pervisor, were subject to the same standards and were engaged in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell,* 964 F.2d at 583.

In his response, Toyee submits that he has established a prima facie case because he was the first trainee in the history of FCI–Milan to be discharged during Institutional Familiarization and the first trainee to be discharged for "inattentiveness" and attitude. Even assuming these facts to be true, as this court must, Toyee's evidence is too casual to be persuasive. Toyee has not presented any evidence that other trainees who engaged in similar conduct, with the same supervisor, were not subject to the same treatment by BOP.

Toyee also argues that three of the four minority group trainees, Toyee being the fourth trainee, who have been discharged during their probationary period were of another national origin. This evidence, however, actually demonstrates that trainees of different national origin were not treated any differently than Toyee.

Toyee's failure to dispute the facts relevant to his qualifications for the job or to his treatment in comparison to other, similarly situated, non-minority trainees, leads this court to conclude that plaintiff has not established a genuine issue as to these elements of his prima facie case. Accordingly, plaintiff's title VII claim must fail.

### 2. Legitimate, Nondiscriminatory Reason for Termination

■ Even assuming, *arguendo,* that Toyee has made out a prima facie case, it is still clear that BOP has articulated legitimate, nondiscriminatory reasons for termination of the plaintiff, to wit: he breached institutional security when he covered the security camera with his identification card, his inattention to duty as exemplified by the restraints class incident and his lack of participation in self-defense class. These reasons for discharging Toyee are legitimate and have nothing to do with Toyee's national origin.

The issue now is whether the record either discredits the legitimate, nondiscriminatory reasons that BOP officials gave for firing Toyee, or demonstrates that invidiously discriminatory reasons more likely than not motivated BOP official's actions. *Terbovitz,* 825 F.2d at 114–15.

### 3. Pretext

■ The record as a whole shows that Toyee was fired not because of his national origin, but because he engaged in a series of incidents during the first three weeks of his employment which illustrated poor judgment, a "know it all" attitude, lack of attention, and that Toyee was not receptive to criticism from superiors. Firing Toyee for these reasons is not a pretext for discrimination because these reasons had nothing to do with Toyee's national origin.

Toyee proffers a series of arguments which he concludes are "indicia of pretext." However, he fails to precisely articulate upon which basis, either to discredit BOP's reasons for discharging him or to show invidious discrimination, he offers these arguments in rebuttal of BOP's legitimate, nondiscriminatory reasons for discharging him. Irrespective of which basis is being articulated, Toyee's arguments are wholly without merit.

For instance, Toyee makes several arguments that BOP did not follow its own written procedures in discharging him. However, Toyee cites no case law that would support his position that even in the absence of evidence of discrimination, BOP's failure to follow its internal guidelines could sustain an action under Title VII. *Cf. Lopez v. Metropolitan Life Insurance Co.,* 930 F.2d 157, 162–63 (2nd Cir. 1991) (finding that the manner of discharge is not sufficient evidence of discrimination for a Title VII action). Regardless, this court finds that BOP followed its termination procedures and that Toyee was given the necessary due process required by 5 C.F.R. § 315.804 which governs termination of probationary employees. 5 C.F.R. § 315.804 only requires that the probationer must receive in writing the reasons for his termination and the effective date of such

action. BOP has satisfied that requirement.

Toyee also argues that it was improper for BOP to terminate him based on subjective observations of his unprofessional attitude and inattention to duty, that he should have been allowed further time to correct his attitude and inattention, and that he should have been allowed to complete the final objective tests during Institutional Familiarization Training prior to being terminated.

■ To the contrary, subjective observations which have nothing to do with Toyee's national origin, but are based on legitimate, nondiscriminatory factors, as the ones in this case were, do not violate Title VII. *See Pesterfield v. Tennessee Valley Authority,* 941 F.2d 437, 443 (6th Cir.1991) (finding that question is *not* whether employer's decision to discharge was correct measured by "objective" standards, but that employer acted in good faith). *See also Fahie v. Thornburgh,* 746 F.Supp. 310, 315 (S.D.N.Y.1990) ("[T]he Bureau's honestly held, although *erroneous,* conviction that [plaintiff] was not a good employee is a legitimate ground for dismissal.") (emphasis added).

Toyee also argues that material questions of fact exist as to the security incident which occurred at the sally-port gates and that, therefore, BOP's reasons for discharging Toyee are merely pretextual. While Toyee's description of the incident at the grills differs slightly from that of the officers in some respects, there is no dispute that Toyee intentionally held a card up to the camera to get the attention of the control room officers, that he held it there for as long as a minute, and that the effect of his doing so was to block and obstruct the view of the security camera. Whether or not it was possible for someone standing in the control room, at that moment, to look directly at the allegedly obscured area is of no import. The fact remains, that Toyee's intentional act of holding the card up to the camera was a breach of prison security which amounts to serious misconduct.

■ Toyee also argues that BOP's consideration of the T-shirt incident in finding that it reflected Toyee's "poor judgment" is another indicia of pretext. Toyee maintains that the T-shirt incident involved nothing more than an innocent misunderstanding of the instructions he received to wear casual clothing on that date. However, it is disingenuous for Toyee to argue that on the one hand he just "grabbed the first tee shirt in his dresser drawer" and yet allege in his complaint that "disciplinary action [was taken] against plaintiff on the basis of the political content of a Malcolm X teeshirt ... *in violation of his free speech rights under the First Amendment....*" (emphasis added). Toyee was either making a statement, in which case BOP could reasonably infer that Toyee was exercising "poor judgment", or he was not making a statement. Toyee cannot have it both ways. Regardless, this court finds that even if BOP wrongly inferred an inflammatory message in Toyee wearing the T-shirt, and used that inference in a finding of "poor judgment", such honestly held beliefs, even if later proven to be wrong, which have no bearing on Toyee's national origin, do not violate Title VII. *See Pesterfield* and *Fahie, supra.*

■ Finally, Toyee argues that the statistical evidence is relevant evidence of intentional discrimination. Toyee claims that despite the large Arab population in the Detroit metropolitan area, he was the only Arab to be hired by FCI–Milan and that he became the only trainee to be discharged during Institutional Familiarization. Therefore, Toyee argues, the rate of the institution's discharge of Iraqi-born employees was 100 percent. Furthermore, Toyee argues that four of the five corrections officers, including himself, who were discharged during probation were members of minority groups and three of these four minorities were of another national origin.

■ Toyee is clearly entitled to use statistical evidence to establish a pattern or practice of discharging employees based on national origin, from which an inference of national origin discrimination may be drawn. *Scales v. J.C. Bradford & Co.,* 925 F.2d 901, 55 FEP 612, 616 (6th Cir.1991). However, the Supreme Court has stated that "[c]onsiderations such as small sample size, may of course, detract from the value of such [statistical] evidence,...." *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 340 n. 20, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977). Here the statistical

sample consists of only one person and thus is of practically no significance. *See Charrette v. S.M. Flickinger, Co., Inc.,* 806 F.Supp. 1045, 1061 (N.D.N.Y.1992). Toyee offers no evidence as to how many Arab-born and/or Iraqi-born persons from the Detroit metropolitan area applied for employment with the BOP. Even if this court were to overlook the small sample size, the statistical evidence against Toyee is compelling. For instance, the record shows that the only Iraqi-born person ever known to apply for employment at FCI–Milan was hired.[3] Moreover, all of the other four trainees who were discharged while on probation were non-Iraqis, demonstrating that Toyee was treated just like them. Therefore, this court does not find persuasive the statistical proof proffered pertaining to the discharge of Toyee.

## V. Conclusion

In sum, this court finds that no reasonable trier of fact could find that the plaintiff has met his burden of showing that he was qualified for the job or that he was treated differently from any similarly situated non-minority. Accordingly, he has failed to make out a prima facie case of discrimination. Moreover, there is utterly no evidence to suggest that Toyee's termination was a mere pretext for discrimination. The record is completely devoid of any facts, let alone genuine issues of material fact, that would cast substantial doubt upon the defendant's proffered reasons for discharging plaintiff or that an unlawful discriminatory factor more likely than not motivated the defendant to discharge the plaintiff. Thus, the defendant is entitled to judgment as a matter of law as to plaintiff Toyee's Title VII claims.

### *ORDER*

Therefore, it is hereby **ORDERED** that the defendant's motion for summary judgment is **GRANTED** in its entirety.

**SO ORDERED.**

---

3. The fact that Toyee was hired and terminated by the same person, Warden Bogan, itself creates an inference of a lack of discriminatory intent.

*Buhrmaster v. Overnite Transportation,* 61 F.3d 461, 464 (6th Cir.1995).