Thomas L. CICERO and Marlene Cicero, Plaintiffs,

v.

BORG–WARNER AUTOMOTIVE, INC., A Delaware corporation, and Borg–Warner Automotive Automatic Transmission Systems Corporation, a Delaware corporation, Defendants.

No. 98–CV–71612–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Nov. 23, 1999.

Michael V. Kell, Margaret A. Lynch, Kell & Lynch, Birmingham, MI, for Plaintiffs.

Thomas L. Fleury, Detroit, MI, for Defendants.

### *ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

CLELAND, District Judge.

#### I.  Background

Plaintiffs brought this diversity case for age discrimination under Michigan law. Pending before the court is "Defendants' Motion for Summary Judgement," filed May 3, 1999. Plaintiffs responded on May 25, 1999, defendants replied on May 28, 1999, and plaintiffs filed a Sur-reply on June 15, 1999. A hearing was held on September 15, 1999.

The relevant facts[1] are largely undis-

---

1. The court would note that the parties' coun-   sels could have used more care in their use of

puted.[2] Plaintiff Thomas L. Cicero was employed by defendant Borg–Warner Automotive Automatic Transmissions Systems Corp. ("BWA–ATS") from April 1995 until his termination effective November 30, 1997. Mr. Cicero alleges that but for the fact that they were age 51 or older, he and three other managers would not have been terminated. Defendants claim that age played no part in that decision.

## A. New Management Takes Over, But Mr. Cicero Is Kept On

On August 1, 1994, Mr. Cicero began his employment as Human Resources Manager with Federal–Mogul's Precision Forged Products Division ("PFPD") in Romulus, Michigan. PFPD manufactured two product lines: a transmission component called a one-way clutch race ("race business") and connecting rods which attach the pistons to the crank shaft ("connecting rod business"). Mr. Cicero had extensive human resource management experience prior to joining Federal–Mogul, having been employed by the Detroit Newspapers as its Director of Labor Relations, as well as by the Detroit Free Press, Inc. in varying capacities as Director of Labor Relations, Director of Employee Relations, Labor Relations Manager, and Personnel Manager. Mr. Cicero was hired at PFPD by Larry Finnell, then Federal–Mogul's general manager. Mr. Cicero was responsible for human resource management at all three of PFPD's plants, located in Romulus, Michigan; Plymouth, Michigan; and Gallipolis, Ohio. (Cicero Dep. at 54, 60–61, 161–62, 581.) During his eight months as PFPD's Human Resources Manager, Mr. Cicero's performance was considered more than satisfactory by Mr. Finnell. *11.94 Federal Mogul Performance Appraisal* (Pl.Ex. C.)

In April 1995, BWA–ATS purchased PFPD from Federal Mogul. BWA–ATS is one of four wholly-owned subsidiaries of defendant Borg–Warner Automotive, Inc. ("BWA"), a holding company located in Chicago, Illinois. BWA performs many of the upper management and administrative functions for its subsidiaries, including providing uniform human resource and in-house legal functions, as well as overall marketing, sales, technology, and research. BWA–ATS, located in Lombard, Illinois, specializes in the research, development, and manufacture of transmission components. BWA–ATS purchased PFPD in order to obtain the race business, but at that time had no anticipated interest in the connecting rod business. (Welding Dep. at 21, 32.)

Upon purchasing PFPD, BWA–ATS elected to retain all of PFPD's employees, including the management staff. (Cicero Dep. at 134–35.) Mr. Finnell became BWA–ATS' vice president and general manager of the PFPD division, and Mr. Cicero was made human resources manager for the division. Mr. Cicero continued to report directly to Mr. Finnell, and was also supposed to report to Mr. Keith McLeod, BWA–ATS Vice President of Human Resources. After the acquisition, Mr. Cicero was assigned the responsibility of integrating PFPD's policies and procedures into those of BWA's corporate organization. (Cicero Dep. at 261, 306, 552.) Those polices and procedures included BWA's pension plan and post-retirement benefits; employee medical and life insurance benefits; salaried bonus plan; non-hourly salary plan; and automobile allowance plan. *(Id.)* BWA brought Mr. Cicero to its Chicago headquarters to meet with Ms. Geraldine Kinsella, BWA Vice President of Human Resources so that Ms.

---

the deposition transcripts filed in this case. Defendants occasionally left out cited pages in their appendix, or the pages preceding the cited pages that would have aided in understanding the quoted material's context. Plaintiffs filed Mr. Cicero and Mr. McLeod's depositions *in toto*, without apparent purpose.

**2.** To the extent there are a small number of disputed relevant facts in this case, they are immaterial to the summary judgment determination because the disputed facts do not provide a basis whereby a jury could return a verdict different from that produced by the undisputed facts.

Kinsella could brief him on BWA policies and allow him to begin implementing the integration process. (*Id.* at 585.)

### B. Mr. Cicero's Performance Problems

#### 1. Mr. Finnell's Evaluations & Mr. Cicero's Bonuses

Mr. Finnell was Mr. Cicero's immediate supervisor and the person responsible for regularly evaluating Mr. Cicero's performance during Mr. Cicero's entire tenure with BWA–ATS. For 1995, Mr. Finnell gave Mr. Cicero high marks for his performance within PFPD:

> I rated Tom a 6 [exceeded job requirements] for his overall contributions to PFPD's success over the last 12 months. His contributions were many and his commitment to this business has been outstanding.

*January 30, 1996 Performance Appraisal* (Pl.Ex. H); (*see also* Finnell Affidavit at 1–2 (Pl.Ex. A)) Mr. Finnell also noted in the same evaluation, however, that:

> The 2 rating is specifically for his *working rapport with BWA Chicago* as this area *will be crucial to his long-term success within ATS/BWA.* I have every confidence of Tom blowing this issue away.

(*Id.* (emphasis added)) A "2" is for performing "below job requirements." (*Id.*) In other evaluations, Mr. Finnell indicated

to Mr. Cicero that he "need[ed] to be more patient and understanding of the BWA culture and strive to make it work." (Cicero Dep. at 554.) In a 1997 evaluation, Mr. Finnell noted that "[Mr. Cicero's] approach ultimately took its toll on his personal relationship with key players within BWA's HR community." (*Id.* at 577). Mr. Finnell later admonished Mr. Cicero again that it was very important for him to improve his relationship with BWA and BWA–ATS management. (*Id.* at 585)

In both 1995 and 1996, Mr. Cicero received "Management Incentive Plan" ("MIP") bonuses from BWA–ATS that were team-based[3] payments for units achieving set financial targets.[4] Kinsella Affidavit at 1–2 (Def. Reply Ex. B); *Dec. 15, 1995 Memo from G. Fukayama* (Pl.Ex. D); *Borg–Warner MIP,* (Pl.Ex. E); *Feb. 5, 1996 Memo* (Pl.Ex. I); *Feb. 10, 1996 Memo from R. Welding* (Pl.Ex. O).[5] Mr. Cicero was also given lump-sum "merit increases" for those same years in lieu of a salary increase under a BWA policy designed to compensate salary-capped employees at an industry-comparable level.[6] *Dec. 18, 1995 Memo from K. McLeod* (Pl. Ex. F); *Change of Status Form* (Pl.Ex. G); *Dec. 20, 1996 Change of Status Form* (Pl. Ex. L); Kinsella Affidavit at 2 (Def. Reply Ex. B).

---

**3.** Though BWA did technically reserve the right to withhold MIP bonuses from individuals based on performance, *see* "*Borg–Warner MIP*" (pl.ex. E), the record evidence is that this only occurred once, apparently at Mr. Finnell's behest to more senior BWA officials, regarding an individual under Mr. Finnell's supervision. *Cicero Affidavit* (Pl. Sur–Reply Ex. A). Other than this singular incident, there is no evidence that anyone at BWA or BWA–ATS ever withheld any MIP bonuses.

**4.** Although plaintiffs initially implied in their Response brief that the MIP was an individually-based merit bonus, they did not challenge in their Sur-reply defendants' Reply assertion that MIPs were based on unit performance.

**5.** Plaintiffs note that the MIP was replaced in 1997 with another plan known as the "Romulus Connecting Rod Business Critical Employ-

ee Retention Plans," though there is no evidence in the record establishing that the new plan was any more individually-based than its predecessor, or that Mr. Cicero received any payment under the plan. At the hearing, plaintiffs' counsel repeatedly claimed that the company's implementation of the new plan proved that it wanted to keep Mr. Cicero. The plan proves no such thing. It is a plan applicable to all primary managers at the Romulus facility, and simply lists the incumbents to whom the plan applies.

**6.** As with the MIPs, plaintiffs implied in their Response that the "merit increases" were based on individual performance. Plaintiffs concede, however, that Mr. Cicero was near the maximum limit of his salary range, (pl. resp. br. at 5), and do not dispute defendant's characterization of the "merit increases" as industry-driven.

## 2. BWA/BWA–ATS Management's Specific Performance Problems With Mr. Cicero

Mr. Finnell's comments regarding Mr. Cicero's "rapport" with BWA Chicago were prescient. The record is replete with testimony from senior BWA and BWA–ATS management officials expressing dissatisfaction with Mr. Cicero's performance. The record demonstrates that:

(1) Despite being instructed by BWA's corporate Director of Group Benefits and Pensions to implement the BWA pension plan and Post Retirement Benefits Welfare Plan for PFPD non-unionized employees, Mr. Cicero installed six pension plans for PFPD. Although Mr. Cicero argued to BWA management that the plans were necessary for corporate morale and union avoidance, the Director believed that Mr. Cicero's endeavors were wasteful, and that Mr. Cicero had done an insufficient job of attempting to promote the BWA plan to PFPD employees. (Turczynowsky Dep. at 11, 25, 34, 38, 39, 45.)

(2) Mr. Cicero failed to integrate the BWA medical plans, resulting in additional expenses for outside consultants and underwriters, and losing the management efficiencies that BWA intended to provide for its subsidiaries. (Turczynowsky Dep. at 52).

(3) Mr. Cicero continued to use a Federal Mogul plan for PFPD post-retirement welfare benefits more than a year-and-a-half after the acquisition, despite being requested to adopt BWA's plan. (Turczynowsky Dep. at 103).

(4) As BWA's representative in union contract negotiations at the Gallipolis plant, Mr. Cicero was uncooperative in achieving some of the primary goals set for those negotiations by BWA's corporate Director of Group Benefits and Pensions, and Vice President of Human Relations. Throughout the negotiations, Mr. Cicero resisted the mandate that he replace the Federal–Mogul defined contribution plan, and repeatedly contacted BWA Chicago to argue against management's position. Though Mr. Cicero eventually negotiated the requested defined benefit plan, the Vice President of Human Relations believed that he had done so only under tremendous pressure from senior management, and that he had failed to achieve BWA's other primary goal of lowering the cost of the medical plan. (Cicero Dep. at 251–52, 577–78; Turczynowsky Dep. at 5–8, 67; Kinsella Dep. at 41, 46, 48–49; Trenda Dep. at 31.) Mr. Cicero was congratulated by both Mr. Finnell and by Mr. Robert Welding, President of BWA–ATS, on achieving the contract. *June 26, 1996 Letter from L. Finnell to T. Cicero* (Pl.Ex. J); *June 28, 1996 E-mail message from R. Welding to T. Cicero* (Pl.Ex. K).

(5) Mr. Cicero was asked by the BWA–ATS Human Resources Vice President to prepare a detailed labor cost analysis in preparation for the Gallipolis negotiations. Defendants allege that Mr. Cicero did not provide the analysis, and upon being confronted about the issue, indicated that he did not know how to perform such an analysis, did not understand why it had been requested, and did not believe that the Vice President needed the information. (McLeod Dep. at 260, 263.) Though not noted in plaintiffs' briefs, Mr. Cicero claims that he furnished this information in a timely manner. Cicero Affidavit at 3 (Pl.Ex. N).

(6) Mr. Cicero failed to convert—as he had been repeatedly instructed to do so by the BWA–ATS Vice President for Human Relations—the non-salary system at the Romulus plant to BWA's standard salary plan using a company-set classification system. Mr. Cicero admitted that it was his responsibility to implement the system and that he did not understand it, even after it was explained to him by the Vice President. He did not ask other BWA personnel to explain the system to him, and he did not even consider assigning the project to someone who did understand it. (Cicero Dep. at 368–69, 372–73, 376–77, 379, 381; McLeod Dep. at 143.)

(7) Mr. Cicero flaunted BWA policy recommending that the BWA Law Depart-

ment be used instead of outside counsel by continuing to use an attorney of his own choosing for PFPD legal matters. Mr. Cicero refused to return the phone calls of BWA's corporate counsel during an ongoing lawsuit, and authorized a settlement in that suit without even notifying the corporate counsel. As a result of this situation, BWA's General Counsel issued a memorandum requiring notification of the Law Department in certain circumstances, and Mr. Cicero was advised that the company would not hire his chosen counsel in the future. By his own admission, Mr. Cicero then violated that instruction by again hiring his chosen counsel for another lawsuit in the fall of 1997. *"Collaboration with Law Dep't"* (Def.Ex. A); (Cicero Dep. at 407, 421, 425, 427, 431, 444; Muensterman Dep. at 24, 47–50.)

(8) BWA and BWA–ATS management officials also found that Mr. Cicero was reluctant to meet with them; on at least one occasion, he refused to do so. (McLeod Dep. at 122, 203; Turczynowsky Dep. at 68).

Other than # (5), Mr. Cicero does not contend that any of defendants' specific assertions regarding his performance are false. Instead, in his affidavit responding to BWA's allegations, he repeatedly professes that he was not "criticized" for his handling of particular issues, and/or that no one ever told him that his actions "constituted unsatisfactory work performance or could result in my termination."

### 3. Mr. Cicero's Relationship With BWA/BWA–ATS Management

In general, BWA and BWA–ATS management officials did not consider Mr. Cicero to be a team player. As Ms. Kinsella, BWA Vice President for Human Relations put it:

Mr. Cicero's behavior was consistent with what we experienced from day one,

which was an inability to understand that we were setting the strategy and defining the parameters of what he could be creative with . . . .

He just did not want to hear the message that we were delivering and did not seem to understand that Borg–Warner Corporation—Borg–Warner Automotive actually owned the Romulus facility. There was never an acknowledgment of that from day one.

(Kinsella Dep. at 46–47). Other BWA/BWA–ATS management officials who had dealt with Mr. Cicero reiterated that sentiment, and they shared their views with their cohorts. (Turczynowsky Dep. at 68; McLeod Dep. at 122, 203; Muensterman Dep. at 103; Welding Dep. at 44, 72–75). Indeed, BWA–ATS President Robert Welding believed that Mr. Cicero had "almost blatantly refus[ed] to integrate this company [PFPG,]" and professed that "every step of the way with Tom was always high resistance." (Welding Dep. at 42). The cumulative effect of Mr. Cicero's actions was that his superiors did not believe that he could be trusted to do what he said he was going to do. (*Id.* at 42–43).

Mr. Cicero himself testified that he was under the impression that his relationship with senior management was not good, and that Mr. Finnell had told him precisely that in his formal evaluations in 1995, 1996, and 1997. (Cicero Dep. at 532, 539–41, 545–46, 554, 564, 572, 586).

### C. Mr. Cicero's Termination

In November 1997, Mr. Welding decided to terminate four top managers at the Romulus plant, including Mr. Cicero, who was then 51 years old. (Def. Br. at 11–12; Pl. Resp. Br. at 7). Mr. Welding also dismissed Mr. Finnell, the plant manager, age 53; Gerald Malen, Sales Manager, age 51; and James Knaus, Controller, age 51. (Pl. Resp. Br. at 7).[7] Five other managers

---

7. Plaintiffs also point out that another manager named Nick Bruno, age 58, who was hired only a few weeks before the other managers were dismissed, was himself terminated in January, 1998, less than three months into his service. (Pl. Resp. Br. at 8). While Mr. Bruno was also apparently replaced by a younger individual, there is no information in the record indicating how Mr. Bruno might be related to any of the actors in this case. In the absence of any further information, Mr. Bruno's very short tenure at Romulus makes him incomparable to the other terminated managers.

between the ages of 39 and 45 were kept on, and a sixth, age 48, was transferred to another position at a different location. (Pl. Resp. Br. at 7; Def. Reply Br. at 5.) Mr. Finnell was replaced by a 44–year old; Mr. Malen by a 50 or 51–year old; and Mr. Knaus by a 39–year old. Mr. Cicero's replacement was 34. (Pl. Resp. Br. at 8.)

Plaintiffs allege that the only managers terminated at the Romulus plant were those older than 50. There is some dispute between the parties as to whether the timing of that decision was related to any decision by BWA to sell the Romulus plant. Plaintiffs allege that BWA had not decided whether to keep the Romulus facility at the time of firing, and therefore could not have had any authentic interest in integrating PFPD into the BWA corporate structure. Moreover, plaintiffs claim that because BWA did not uniformly terminate everyone categorized as a "Senior Manager" or "Key Manager" (as described in the "Critical Employee Retention Plan," pl. ex. Q), but instead only terminated those older than 50, the selective firings provide evidence of age discrimination. Defendants respond that the terminated individuals were those with whom Chicago management had a direct relationship, and who were held accountable for the Romulus plant's unsatisfactory overall performance.

In sum, plaintiffs claim that Mr. Cicero's performance was more than satisfactory during his years with BWA–ATS. They argue that the termination of the four managers who were all over age 51, including Mr. Cicero, and the subsequent replacement of three of them by younger individuals, is evidence that Mr. Cicero's dismissal was due to age discrimination. Defendants claim that Mr. Cicero was dismissed solely for unsatisfactory job performance.

## II.  Standard [8]

Under Rule 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party

is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The existence of some factual dispute does not defeat a properly supported motion for summary judgment; the disputed factual issue must be material.

The burden placed upon the movant for summary judgment is to show that the non-moving party has failed to establish an essential element of its case upon which the non-moving party would bear the ultimate burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548. But the moving party need not support its motion with affidavits or other similar materials "negating" the opponent's claim. *Id.* at 323, 106 S.Ct. 2548. Once the moving party meets this burden, the burden passes to the non-moving party to establish, after an adequate opportunity for discovery, the existence of a disputed factual element necessary to its case with respect to which it bears the burden of proof. *Id.* The non-moving party must show that there is sufficient evidence for a jury to return a verdict in its favor, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989) (citation omitted), that is, that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant. *Id.* at 1478 (citation omitted). The non-moving party must present affirmative evidence on critical issues. *Id.* at 1477.

## III.  Discussion

The amended complaint has two claims. The first is Mr. Cicero's age discrimination claim. The second is Mrs. Cicero's deriva-

---

**8.**  Neither party mentioned the summary judgment standard in their briefs or analyzed the

arguments within its context. The court recommends that counsel do so in the future.

tive claim for loss of consortium. Defendants' summary judgment motion deals with the legal merits of the first claim. Because summary judgment will be granted on the first claim, the second will also necessarily be dismissed.

### A. Michigan's Age Discrimination Standard

Mr. Cicero brings this action for age discrimination under Michigan's Elliott–Larsen Civil Rights Act,[9] which states in relevant part that:

> (1) An employer shall not do any of the following: (a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . age . . . [ ]

MCL 37.2202(1)(a), (1999). A plaintiff bringing suit under the act must first establish a prima facie case of discrimination. *Lytle v. Malady*, 458 Mich. 153, 172–73, 579 N.W.2d 906 (1998) (*"Lytle II"*).[10]

> [O]nce plaintiff has sufficiently established a prima facie case, a presumption of discrimination arises. The burden then shifts to the defendant to articulate a 'legitimate, non-discriminatory reason' for plaintiff's termination to overcome and dispose of this presumption[.] . . . Defendant's response constitutes the second stage of proof, in which the burden shift[s] to defendant. At this stage, defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of material fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity.

> Once the defendant produces such evidence, even if later refuted or disbelieved, the presumption drops away, and the burden of proof shifts back to plaintiff.

*Id.* at 173–74, 579 N.W.2d 906 (internal citations and quotations omitted). Upon reaching this third stage of proof, plaintiff must show by a preponderance of admissible evidence, direct or circumstantial, that there exists a triable issue that the employer's proffered reasons were not the true reasons, but were a mere pretext for discrimination. *Id.* at 174, 579 N.W.2d 906.

#### 1. The Prima Facie Case

To establish a prima facie case of age discrimination, plaintiff must prove by a preponderance of the evidence, that:

> (1) he was a member of the protected class;

> (2) he suffered an adverse employment action;

> (3) he was qualified for the position; and

> (4) he was replaced by a younger person.

*Lytle II*, 458 Mich. at 177, 579 N.W.2d 906.

Defendants assert that plaintiffs have failed to make out a prima facie case of age discrimination. Though Mr. Cicero is concededly within the protected class, i.e. employees aged 40 to 70 years, *see id.* at 177 n. 26, 579 N.W.2d 906, and undoubtedly suffered an adverse employment action, namely, his termination, defendants assert that he has not met the third and fourth required prongs of the production. Defendants claim that Mr. Cicero does not meet the fourth requirement because he was not replaced by a "substantially" younger per-

---

**9.** In briefing this Motion, neither party quoted the controlling statutory language. The court advises counsel to do so in the future.

**10.** In briefing, plaintiff utterly ignored this most recent controlling authority on age discrimination under Michigan law.

son. Defendants do not direct the court to any controlling authority as to how such a standard might be measured, and as plaintiffs correctly point out, the Michigan Supreme Court has held that the significance of age differences in these claims should be evaluated on a case-by-case basis. *See Lytle v. Malady,* 456 Mich. 1, 40 n. 44, 566 N.W.2d 582 (1997) (*Lytle I*)(vacated in part on rehearing by *Lytle II,* 458 Mich. 153, 579 N.W.2d 906 (1998)). In light of the court's determination of the other issues presented in this case, there is no need for the court to address whether Mr. Cicero was replaced by a "substantially" younger person.

### a. Whether Mr. Cicero Was "Qualified" For His Position

■ In regard to the third prong, defendants assert that Mr. Cicero was not "qualified" for his position, as that term is understood under Michigan law. The parties correctly agree that the qualification issue is controlled by the Michigan Supreme Court's decision in *Town v. Michigan Bell,* 455 Mich. 688, 568 N.W.2d 64 (1997). The parties quibble, however, over which statement in *Town* sets the standard. Defendants posit that:

> To establish that he was "qualified" a complainant must show that he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance, absolute or relative.

*Id.* at 699 n. 22, 568 N.W.2d 64 (internal citations and quotations omitted). Plaintiffs alternatively assert that:

> An employee is qualified if he was performing at a level that met the employer's legitimate expectations.

*Id.* at 699, 568 N.W.2d 64. Regardless of which definition controls, however, no reasonable jury could conclude that Mr. Cicero was qualified under Michigan law. The evidence he has presented does not rule out the possibility that he was fired for inadequate job performance, or that he was performing at a level that met his employer's legitimate expectations. In-

deed, Mr. Cicero's own testimony and documents, as well as those of Mr. Finnell, the witness upon whom he relies to prove his "qualification," amply demonstrate that BWA/BWA–ATS in fact did consider his performance to be inadequate, and that he was not meeting his superiors' expectations.

Mr. Cicero testified that, while he was still in BWA–ATS's employ, he would on occasion leave his BWA/BWA–ATS superiors with the "perception that I was not working with Borg–Warner but working against them." (Cicero Dep. at 532.) In every year that Mr. Finnell formally evaluated Mr. Cicero, Mr. Finnell specifically told Mr. Cicero that he needed to drastically improve his relationship with his superiors in Chicago. Mr. Cicero admits that he severely aggravated his superiors by his conduct of the Gallipolis negotiations, and that he knew of the aggravation because he discussed the issue with Mr. Finnell. He repeatedly stated that he did not understand how to convert the non-salary plan at the Romulus plant to the BWA salary system, and that he failed to do so even though it was his responsibility, and that he made virtually no effort to obtain help in meeting that responsibility. Finally, Mr. Cicero testified that he chose to ignore the corporate policy regarding retaining outside legal counsel and of keeping the law department apprised of legal matters, even to the point of engaging in insubordination in the early fall of 1997 by rehiring his preferred attorney after specifically being told not to do so. Mr. Cicero was terminated in November 1997. Given these facts that he acknowledges knowing at the time he was employed, Mr. Cicero cannot plausibly claim to have ruled out the possibility that he was terminated for inadequate performance, or realistically claim that he was meeting his employer's legitimate expectations. *See, e.g. Kahl v. The Mueller Co.,* 173 F.3d 855, 1999 WL 196556 at *5 (6th Cir. April 1, 1999).

At the hearing, plaintiffs' counsel argued that it was unreasonable under the "legitimate expectations" standard for an employer to expect "perfection" from an employee. "Legitimate expectations," she asserted, should be measured at the time of employee performance. Counsel's first assertion is a straw man, and the second misconstrues reality. Defendants do not claim that Mr. Cicero failed to meet a standard of perfection; they claim that he failed to carry out many of his fundamental responsibilities, and in some cases, actively resisted them. The typical employer may not be entitled to expect perfection, but it is entitled to expect an employee to do his job.

Temporal reality dictates that an employee is evaluated *after* he has performed an assigned task. That evaluation may be immediate and discrete. It may be cumulative and long-term. It may be some combination thereof. And it is entirely possible—indeed, perhaps probable—that an employee's performance may be mixed. There may be some successes with the failures. It may be that what were initially passed over in short-term evaluations as isolated inadequacies or marginally satisfactory performances are determined by the employer in the longer term to be an unacceptable failure to meet expectations. *See, e.g. Lamont v. MSX Int'l,* 63 F.Supp.2d 778, 781–82 (E.D.Mich.1999).

But two things are absolutely clear. First, it is the employer, not the employee or his attorneys, who gets to decide what those expectations will be. *See, e.g. McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1160 (6th Cir.1990) (a plaintiff "does not raise a material issue of fact on the question of the quality of his work merely by challenging the judgment of his supervisors"). Second, it is the employer's unquestioned prerogative to evaluate its employees at the time of its choosing, in whatever manner it pleases, without being second-guessed by counsel or the courts. The only role for the legal process to play in evaluating the "legitimate expectations" standard is where the other elements of the prima facie case have been met, and

the plaintiff can proffer evidence either that he was being asked to meet standards that were somehow illegitimate (probably to be proved by inference), or that he in fact met *all* of the employer's legitimate expectations. *See Jacklyn v. Schering–Plough Healthcare Products Sales Corp.,* 176 F.3d 921, 929 (6th Cir.1999). Mr. Cicero does not claim either event here. Plaintiffs may not file a lawsuit and substitute their own expectations for those of the employer. Nor do they have the option of overriding the employer's performance evaluation methods with their own preferred criteria. In this lawsuit, plaintiffs have attempted to do just that.

Plaintiffs' evidence alone establishes that Mr. Cicero was not "qualified" for his position under Michigan law, thereby requiring that summary judgment be granted. Even assuming, *arguendo,* that plaintiffs have established a prima facie case, the remaining analysis makes clear that their claim cannot survive summary judgment.

### 2. The Employer's Proffered Reasons for Termination

As stated in Section I, defendants have offered ample justification for Mr. Cicero's dismissal. BWA alleges the following regarding Mr. Cicero's performance: His implementation of the pension plan was unsatisfactory; he failed to integrate the medical plans; he continued using the predecessor company's post-retirement welfare benefits program despite being asked to replace it; he aggravated senior management with his handling of the Gallipolis negotiations by both resisting the instructions he was given and failing to meet both of BWA's primary objectives; he did not produce detailed labor cost analyses for those negotiations as he had been requested to do; he utterly failed to even try to convert the non-salary plan at the Romulus plant; he ignored company policy regarding the handling of legal matters and was insubordinate in that regard; he resisted meeting with his superiors, and he refused to do so on at least one occasion.

In general, the defendants allege that Mr. Cicero was not a team player and wanted to continue doing things his own way, heedless of the new management's instructions. Defendants have more than met their burden of production.

### 3. Plaintiffs' Attempt to Show that the Employer's Reasons Are Pretextual

The burden of defeating an employer's proffered reasons is a high one. Plaintiffs must demonstrate evidence not only that the employer's given reasons are false, but that the disproof "raises a triable issue that discriminatory animus was a motivating factor underlying the employer's adverse action." *Lytle II*, 458 Mich. at 175, 579 N.W.2d 906. Plaintiffs attempt to demonstrate that BWA/BWA–ATS' proffered reasons are false, either by refuting them directly, or by demonstrating that Mr. Cicero was treated differently than similarly situated employees. *See Lytle II*, 458 Mich. at 174, 178, 579 N.W.2d 906. They offer six reasons toward that end:

(1) Mr. Cicero received favorable reviews from his superiors;

(2) He received bonuses in 1995 and 1996;

(3) He was terminated, whereas another Romulus plan manager with performance problems was not;

(4) During his employment, the criticisms brought forth in this lawsuit were not specifically discussed with him and he was not told that his job was in jeopardy;

(5) Only the managers aged 51 or older were fired, instead of all the Romulus managers.

(6) BWA had not decided whether to sell the Romulus plant, and therefore could not have actually terminated him for failing to integrate PFPD into the BWA corporate structure because BWA did not know whether it really wanted to integrate.

Though true (except, perhaps, for reason (6)), each of these rebuttals is irrelevant to disproving defendants' proffered explanations, and fails to raise issues of disputed material facts that could allow this case to go to a jury. None of them can disprove the employer's justifications, much less indicate discriminatory animus. Each is dealt with in turn:

#### a. The Performance Evaluations

■ Mr. Cicero did receive numerous positive evaluations from Mr. Finnell—about Mr. Cicero's performance *within* PFPD. As previously discussed, however, Mr. Finnell also repeatedly told Mr. Cicero that Mr. Cicero's relationship with Borg–Warner management was unsatisfactory, which is the very reason defendants proffer for Mr. Cicero's termination. Hence, there is no dispute as to this material fact. Moreover, Mr. Finnell was himself terminated for unsatisfactory performance in running the Romulus plant, which included his management of Mr. Cicero. Regardless, this evidence is almost irrelevant. The law does not state that an employee must meet his *supervisor's* legitimate expectations, it requires that he meet his *employer's* expectations. Mr. Cicero's employer was BWA–ATS, not Mr. Finnell (or Mr. McLeod). That other corporate employees may have been satisfied with another employee is not determinative of whether the employer was satisfied. The uncontroverted evidence is that BWA was not satisfied with Mr. Cicero's performance.

Finally, the singular fact that BWA–ATS President Welding sent Mr. Cicero a congratulatory e-mail on the completion of the Gallipolis negotiations a year-and-a-half before terminating Mr. Cicero is demonstrative of nothing relevant. There is no evidence that Mr. Welding had been briefed at that point on the difficulties Mr. Cicero's superiors in those negotiations had experienced with him. Nor is there anything unusual about a superior commending a subordinate on the completion of an important task, even where that performance is substandard, particularly when that task is viewed in isolation. Viewed in the context of two-and-a-half-years worth of performance, however, the

deficiency can be quite glaring. The positive reviews Mr. Cicero received during those years on certain aspects of his performance do nothing to dispel his inadequacy in others. *See, e.g. Lamont,* at 782.

### b. The Bonuses

■ Though Mr. Cicero did receive "performance" and "merit increase" bonuses in both 1995 and 1996, there is no evidence that either bonus was tied to *his* individual performance. The "performance" bonus was related to PFPD's performance each year, and the "merit increase" was the result of a company policy providing supplements to salary-capped individuals such as Mr. Cicero, in order to remain competitive in the industry. Even if the bonuses were tied to Mr. Cicero's individual performance, that would still not in any way mitigate his employer's right to terminate him on the basis of accumulated deficiencies.[11] Finally, where employers routinely give bonuses, as was the case at BWA, morale and personnel retention considerations make it unlikely that the bonus of any individual not in imminent jeopardy of termination would be withheld. Indeed, President Welding wrote that Mr. Cicero and the other PFPD managers received their 1996 MIP bonuses in spite of PFPD falling short of expectations. *1996 MIP–PFPD Management* (Pl.Ex. O)

### c. The Other Employee Who Was Not Terminated

■ Mr. Cicero claims that his firing can be shown to be pretextual because another Romulus plant manager by the name of Jay Esty, age 35, was not fired despite known performance deficiencies. Mr. Esty was the quality control manager at Romulus, and also reported to Mr. Fin-

nell. Mr. Cicero had three direct subordinates, while Mr. Esty had two. Mr. Esty allegedly failed to integrate BWA–ATS policies and procedures in selecting a registrar for the QS 9000 certification process. Cicero Affidavit at 5 (Pl.Ex. N).

Mr. Cicero bears the burden of showing that other employees to whom he compares himself were similarly situated. *Lytle II,* 458 Mich. at 178 n. 28, 579 N.W.2d 906 (internal citation omitted); *see also Jacklyn,* 176 F.3d at 929; *Pierce v. Commonwealth Life Insurance Co.,* 40 F.3d 796, 801–02 (6th Cir.1994). Mr. Cicero claims to be comparable with Mr. Esty because Mr. Esty had a similar number of subordinates, also reported to Mr. Finnell, and also failed to implement a significant BWA policy. Though the parties disagree whether Mr. Esty had a performance failure, that issue need not be addressed because Mr. Cicero has failed to meet his burden. Defendants point out that in addition to having a different job description than Mr. Cicero, Mr. Esty was not directly accountable to BWA/BWA–ATS senior management, whereas Mr. Cicero was. Mr. Esty dealt only with plant operations, and reported only to Mr. Finnell. (Welding Dep. at 37–42, 80; Def. Reply Ex. A; Def. Reply Br. at 3.) Moreover, Mr. Cicero fails to provide any evidence of the magnitude of Mr. Esty's performance failure, much less any evidence of systemic problems like his own. Mr. Cicero has not shown that "all of the relevant aspects of his employment situation were nearly identical" to those of Mr. Esty's, and therefore he has raised no issue of disputed material fact. *Town,* 455 Mich. at 699–700, 568 N.W.2d 64 (citing *Pierce,* 40 F.3d at 802) (internal quotations omitted); *see also Ly-*

---

**11.** At the hearing, plaintiffs' counsel relied on Mr. Cicero's interpretation of the "1997 Merit Increase Guidelines" (pl.ex. M) for the proposition that "someone" at BWA must have been happy with his performance because the amount of his merit increase bonus that year indicated that it had been calculated in the "exceeded job requirements" matrix. Defendants' affidavit establishing that the merit increase was in reality a salary supplement still

remains unrebutted. As earlier indicated, even assuming, *arguendo,* that plaintiffs' characterization were accurate, the fact that someone at some time may have found Mr. Cicero deserving of a bonus does not alter BWA's absolute right as an employer to critique his performance at a later time and take whatever measures it deemed appropriate in light of that critique.

*tle II,* 458 Mich. at 178–180, 579 N.W.2d 906.

### d. The Lack Of Criticism

■ Plaintiffs note that Mr. Cicero's personnel file does not reflect the criticisms of his performance raised by defendants in this lawsuit, and furthermore, that no one ever told him that he was performing unsatisfactorily or that his job was in jeopardy. Plaintiff's argument is specious. Employers are under no obligation to record and file every employee performance deficiency, though doing so certainly eases the burdens of recollection should litigation later ensue. Defendants have produced extensive evidence in the forms of sworn testimony and written evaluations indicating that Mr. Cicero's performance was deficient in many ways. Except for the pre-Gallipolis negotiations labor cost analysis, Mr. Cicero does not contradict those allegations. Indeed, he corroborates much of it. As to the remainder, Mr. Cicero responds in his affidavit to defendant's various allegations by merely stating repeatedly that he "was never criticized" or told that his "unsatisfactory performance" "could result in [his] termination." (Cicero Affidavit at 2–3; Pl.Ex. N). As both an adult member of the workforce and an experienced human resource manager, Mr. Cicero could not reasonably have expected that someone had an obligation to tell him that ignoring and resisting company policies; failing to perform assigned tasks; aggravating his superiors; and insubordination constituted unsatisfactory job performance and might result in his termination. No reasonable jury could consider his subjective expectation as evidence of pretext or discrimination.[12]

### e. The Terminated Cohort

■ Plaintiffs claim that because BWA/BWA–ATS fired all four members of the Romulus management team who were aged 51 or older and replaced three of them with substantially younger individuals, BWA's reasons can be construed as pretext for age discrimination. Even putting aside the overwhelming evidence to the contrary,[13] plaintiffs are incorrect as a matter of law.

■ Statistical evaluations ("disparate impact analysis") of an employer's subjective decisions are permissible in a disparate treatment case brought under Michigan law. *See Squire v. General Motors Corp.,* 434 Mich. 884, 452 N.W.2d 210 (1990)(vacating *Squire v. General Motors Corp.,* 174 Mich.App. 780, 436 N.W.2d 739 (1989) in light of *Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988)). However, the United States Supreme Court has repeatedly warned courts to be wary of simplistic percentage comparisons based on small sample sizes. *See Watson,* 487 U.S. at 1000, 108 S.Ct. 2777 ("It may be that the relevant data base is too small to permit any meaningful statistical analysis."); *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 339 n. 20, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (rejecting as "meaningless" percentage comparisons based on membership of 13–member panel); *Mayor of Philadelphia v. Edu-*

---

**12.** Plaintiffs make the *non sequitur* argument that because BWA–ATS Vice President of Human Resources Keith McLeod did not personally intend to terminate Mr. Cicero at the time of Mr. Cicero's unsatisfactory performance with the salary conversion, BWA/BWA–ATS management could not have been dissatisfied with Mr. Cicero's performance over a year later enough to want to terminate him.

**13.** As the Sixth Circuit observed in *Abbott v. Federal Forge, Inc.:*

[t]he mere presence of a disparity in an employer's work force is not enough to establish a prima facie case of disparate impact. Disparities occur naturally in work forces for a multitude of non-discriminatory reasons. Recognizing that fact, disparate impact doctrine requires that a specific employment practice be shown to have caused the disparity. By not establishing a connection between the specific employment practice and the demonstrated disparity, [plaintiffs] fail[ ] to meet the standards of a disparate treatment case.

912 F.2d 867, 875 (1990).

*cational Equality League,* 415 U.S. 605, 620–21, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974). Plaintiffs' brief cited not a single case to support the use of their small sample, despite extensive authorities to the contrary cited in defendants' initial brief. Instead, plaintiffs contented themselves with citing at the hearing a single case, *EEOC v. New York Times Broadcasting Service, Inc.,* 542 F.2d 356, 360 (6th Cir. 1976). In that case, while noting the problems inherent in small statistical samples, the court found that where the employer had made a statement indicative of potential discriminatory animus, a sample size of five might be properly considered by the district court. Plaintiffs have not proffered, and do not allege, any overt evidence of age animus by BWA/BWA–ATS. Accordingly, *New York Times* is inapposite. And as the subsequent discussion here demonstrates, the case law in the twenty-three years since that decision has made its statistical holding obsolete.

The Sixth Circuit and this court have repeatedly noted that small sample sizes render such statistics of little use. *See, e.g. Abbott,* 912 F.2d at 873; *Simpson v. Midland–Ross Corp.,* 823 F.2d 937, 944 (6th Cir.1987) *Black v. City of Akron,* 831 F.2d 131, 134 (6th Cir.1987); *Toyee v. Reno,* 940 F.Supp. 1081, 1093 (E.D.Mich. 1996). Indeed, the case law in this circuit makes it abundantly clear that plaintiffs' sample size is of no probative value. This is true regardless of whether the sample is the four individuals who were dismissed, or the three who were replaced with younger individuals. *See Hooper v. Cargill, Inc.,* 187 F.3d 635, 1999 WL 552560 at *4 (6th Cir.1999) (unpublished opinion) (extremely small sample size of three insufficient); *Gault v. Zellerbach,* 172 F.3d 48, 1998 WL 898831 at *2 (6th Cir.1998) (unpublished opinion) (sample size of six too small); *Martin v. United States Playing Card Co.,* 172 F.3d 48, 1998 WL 869970 at *4–5 (6th Cir.1998) (unpublished opinion) (sample sizes of seven or eleven insufficient to demonstrate pretext); *Tinker v. Sears, Roebuck & Co.,* 127 F.3d 519, 524 (6th Cir.1997) (sample size of thirteen too small); *Anderson v. Premier Industrial Corp.,* 62 F.3d 1417, 1995 WL 469429 at *6–8 (6th Cir.1995) (unpublished opinion)(sample of eight insufficient); *Osborne v. Brandeis Machinery & Supply Corp.,* 1994 WL 486628 at *2 (6th Cir. June 15, 1994)(unpublished opinion) (eight person sample too small to support discrimination case); *Simpson,* 823 F.2d at 943 (questioning sample size of seventeen). Accordingly, plaintiffs' statistical argument is utterly without merit.

Plaintiffs' counsel conceded at the hearing that she had no idea whether BWA/BWA–ATS had retained other Romulus plant employees who were older than 50 when the four managers were terminated. Instead, counsel relied entirely on the distinction made in the Critical Employee Retention Plan between "Senior Managers" and "Key Mangers." Counsel argued that if BWA–ATS really meant to hold people accountable for poor performance, it would have terminated everyone in each of those categories, instead of just firing those individuals older than age 50. Counsel's argument is unavailing. Notwithstanding defendant's perfectly plausible position that it terminated the individuals who reported directly to Chicago and whom it believed were responsible for Romulus' poor overall performance, counsel does not have the prerogative of substituting her business judgement for that of the employer. BWA/BWA–ATS had the right to terminate any of its managers at will. An employer is free to internally characterize its employees in whatever fashion it chooses without having to worry that litigants or the courts will later impose their own notions of what those characterizations ought to entail.

### f. The Timing Of The Romulus Plant Sale

Finally, plaintiffs allege that because BWA senior management was unsure in the fall of 1997 of whether it would keep or sell the Romulus plan, its termination of Mr. Cicero for purportedly failing to integrate the facility into the BWA cor-

porate structure must have been pretextual because BWA did not know at that time whether it really wanted to integrate. Once again, plaintiffs attempt to substitute their business judgment for that of the employer. It is none of plaintiff's concern whether BWA intended to sell the facility, or when it intended to do so. What was—or should have been—Mr. Cicero's concern was integrating PFPD into the BWA corporate structure. It is not his place to decide that the assignments he was given were not legitimate, or that BWA should have utilized his skills differently, or that it should have had different priorities in managing the Romulus plant. BWA/BWA–ATS gave Mr. Cicero a job to do, and he did not do it. Plaintiffs' argument is completely without merit.

### B. Mrs. Cicero's Claim For Loss of Consortium

Because Mrs. Cicero's claim for loss of consortium is premised on the assumption that her husband was unlawfully terminated, judgement will be granted against that claim as well.

### IV. Conclusion

In both their brief and throughout the hearing, plaintiffs' counsel consistently reiterated the phrase upon each of their assertions that, "at the very least, this creates a material issue of disputed fact," and that as a result, the case should reach a jury. Counsel's repetition of the summary judgment standard has reduced it to a meaningless shibboleth. If anything, this case is remarkable for the facts that are not in dispute. By itself, Mr. Cicero's own testimony clearly establishes that he did not meet his employer's expectations, and that there existed more than ample reason to terminate him. The documents, and testimony of other witnesses only buttresses that central fact. Except for a few immaterial details, the parties' factual assertions are not in conflict.

What plaintiffs and their counsel dispute are the legal consequences of those facts. As plaintiffs' counsel must know, however, legal determinations are the sole province of the court. Counsel may not plead to a jury their version of what the law ought to be. And as explained above, the law is well settled in this area. A routine reading of the two controlling Michigan Supreme Court cases on this issue, *Lytle v. Malady*, 458 Mich. 153, 579 N.W.2d 906 (1998) and *Town v. Michigan Bell*, 455 Mich. 688, 568 N.W.2d 64 (1997), should have apprised plaintiffs' counsel that Mr. Cicero did not have a sustainable case under state law. Mr. Cicero was not "qualified" under Michigan law, and thus failed to produce a prima facie case of age discrimination. In the event that he had, he offered no evidence that even remotely refutes BWA's legitimate reasons justifying his termination. His wife's claim for loss of consortium is derivative of his baseless claim, and similarly will be denied.

In short, the court views plaintiffs' case as factually and legally frivolous. There exists no reading of the facts presented by Mr. Cicero that could lead any reasonable jury to believe that he was the victim of age discrimination. Plaintiffs' entire brief, as well as Mr. Cicero's affidavit, evince a belief that Mr. Cicero had a legal right to employment. Michigan law is to the contrary. Mr. Cicero was employed at will, and both he and his counsel should know that he is not entitled to compensation for simple termination where there exists no evidence of discrimination.

At base, Mr. Cicero's case rests on nothing more than the fact that he was 51 years old when he was terminated. That is not a legally cognizable injury. If Mr. Cicero's discharge would have taken place without regard to age discrimination, then he cannot recover. *See Matras v. Amoco Oil Co.*, 424 Mich. 675, 691, 385 N.W.2d 586 (1986). Mr. Cicero has offered not a shred of evidence to the contrary, and judgment will be entered for the defendants.

Accordingly, IT IS ORDERED that defendants' motion for summary judgment is GRANTED.

IT IS FURTHER ORDERED that should defendants elect to seek costs and fees pursuant to Fed.R.Civ.P. 54, a brief of not more than seven pages and an accounting must be FILED with the court not more than two weeks after receipt of this order. Should such a motion be made, plaintiffs will have ten days from receipt of said brief to file a response of identical length.